Filed 12/6/24  P. v. Ross CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>TYMERE ANTHONY ROSS,<br><br>  Defendant and Appellant. | F085822<br><br>(Super. Ct. No. BF173073B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2022, a jury convicted appellant Tymere Anthony Ross of second degree murder for the 2017 death of Hardeep Singh (Pen. Code, § 187;[1] count 1). The jury also convicted Ross of active participation in a criminal street gang (§ 186.22, subd. (a); count 6).

The jury found true that Ross was a principal in the murder, and at least one principal intentionally and personally discharged a firearm (§ 12022.53, subds. (d), (e)(1)). For the murder, the jury found true a gang enhancement (§ 186.22, subd. (b)(1)).

Ross was sentenced to prison for 15 years to life, which was enhanced by 10 years for the firearm. In count 6 (active gang participation), the trial court imposed an upper term, which was stayed. Ross was also sentenced in three other pending felony cases.

In this matter, Ross was tried with his codefendant, Kenton Michael McDaniel.[2] It was the prosecution's theory that McDaniel was the shooter, and Ross aided and abetted first degree felony murder. The jury, however, acquitted Ross of first degree murder. In counts 2 through 5, the jury acquitted Ross in two counts of conspiracy, one count of attempted robbery, and one count of attempted burglary.

Similar to Ross, the jury convicted McDaniel of second degree murder. However, the jury rejected the prosecution's theory that McDaniel was the shooter, finding it not true that McDaniel personally discharged a firearm. The jury did not identify the shooter. It appears the jury must have concluded that J.T., a minor, was the shooter. J.T. was present at the crime scene, but he did not participate in this trial.

Ross contends that his murder conviction must be reversed for insufficient evidence because nothing demonstrates his own malice for murder. Respondent disagrees, arguing that the record either shows Ross held his own intent to kill or he acted

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     In companion appeal number F085937, we resolve issues which McDaniel raises.

with implied malice. After scrutinizing the record, we agree with Ross, and we reject respondent's assertions. Insufficient evidence supports the second degree murder conviction, which must be reversed. Nothing establishes Ross's own malice, which may not be imputed to him simply because he was involved in the events leading up to Singh's death. (§ 188, subd. (a)(3).)

Ross's gang conviction in count 6 was based on this murder. As such, it must also be reversed for insufficient evidence. Accordingly, we vacate this criminal judgment. The trial court shall resentence Ross on his remaining felony cases.

## BACKGROUND

Neither Ross nor McDaniel testified at trial. We summarize the material trial facts. We provide additional details later in this opinion when relevant to the specific issues raised.

### I. Singh's Murder.

On November 24, 2017, Hardeep Singh was fatally shot with a .45-caliber gun. The bullet entered his face and exited the back of his head. The shooting occurred at Singh's apartment complex in Bakersfield, California. Singh was shot while he was standing outside.[3] This shooting was reported to authorities at around 11:25 p.m. When officials turned over Singh's body, they discovered a kitchen knife lying under him.

Just before the shot occurred, one witness heard a possible argument between Singh and another man. After the shot was fired, two witnesses saw a single black male running away. That suspect entered a vehicle, which sped off. One witness saw the suspect get into the front passenger seat.

---

[3] At the time of his death, Singh had morphine, methamphetamine, and alcohol in his blood system.

3.

Law enforcement eventually identified and arrested four suspects: (1) Hawthorne; (2) Ross; (3) McDaniel; and (4) J.T., who was a minor when this murder occurred. J.T. did not participate in this trial.

On the night Singh was killed, Hawthorne was working as a prostitute. Earlier that evening, Singh contacted her for a date after she had posted an advertisement for her services. Singh and Hawthorne had not previously met.

Hawthorne drove to Singh's apartment complex with Ross, McDaniel and J.T. in her vehicle. She arrived at around 11:00 p.m. It took her about 10 minutes to find Singh. She parked her vehicle, and she went alone to meet Singh, who was waiting for her outside.

According to Hawthorne, Singh rejected her services because he did not "want a black girl." Hawthorne testified that Singh's rejection of her was not a big deal, and it was common in prostitution. She went back to her vehicle. At trial, she denied seeing Singh with a knife or other weapon.

According to Hawthorne, as she drove away, McDaniel told her to stop, saying he needed to use a restroom. First McDaniel and then J.T. exited her car. A short time later, Ross also exited her vehicle. Hawthorne heard a single shot. Hawthorne told the jury that Ross was not gone very long before the shot was fired, and he was the first to return to her vehicle. She said it took another 30 or 40 seconds before McDaniel and J.T. returned to her car. According to Hawthorne, McDaniel was holding a firearm when he got into the rear passenger seat.

Hawthorne testified that, after everyone got back into her vehicle, Ross and J.T. were screaming at McDaniel asking, "[W]hy did you do that?" According to Hawthorne,

McDaniel said he had to get out his aggression because his girlfriend had been assaulted, and he was mad.[4]  McDaniel said that Singh "swung a knife at me."

Hawthorne told the jury that McDaniel pointed his gun at her and told her to drive away.  At some point, J.T. commented that, if McDaniel was going to shoot, then McDaniel should have looked in Singh's pockets for money.

Law enforcement found a phone charger lying on the ground near Singh's body. McDaniel's deoxyribonucleic acid (DNA) was on that charger.  The DNA on the charger was a mixture from multiple sources.  McDaniel's DNA was a minor contributor to that sample, while an unknown female was the major contributor.  It is 120 billion times more likely that McDaniel contributed his DNA to this sample than a random person in the African American community.

## II.     The Motive for Singh's Murder is Unclear.

It does not appear that property was taken from Singh.  He had an iPhone and $200 in his pocket.  He was wearing jewelry.  Nothing was disturbed in his apartment, which was nearby.

On the night in question, Ross, McDaniel and J.T. were active gang members with the West Side Crips.  There was no evidence that Singh was a member of any gang. Singh's apartment complex was outside the normal territory of the West Side Crips.

The prosecution attempted to establish robbery or burglary as the motive for this crime.  Earlier in 2017, Ross had accompanied Hawthorne on a prostitution date involving a different client.  Ross had stolen cocaine from that other client, which he shared with Hawthorne.

It was the prosecution's theory that Ross accompanied Hawthorne on her date with Singh in order to rob Singh, or to burglarize his apartment.  It was the prosecution's

---

[4]     According to a detective at trial, Hawthorne previously stated that McDaniel had "said something about his girlfriend had been kicked in the stomach by some East Siders, and he had to get some frustration out."

5.

theory that Ross arranged for McDaniel and J.T. to accompany them for that purpose. According to the prosecution, Singh was killed during an attempted robbery or burglary.

At trial, Hawthorne testified that she was never aware of any plan that Singh would be robbed. She claimed that, when she picked up Ross to drive to her date with Singh, Ross had insisted that McDaniel and J.T. would also accompany them. She had initially refused, but she eventually relented. Hawthorne testified that, before that night, she had never met McDaniel.

Hawthorne believed that Ross, McDaniel, and J.T. were going to remain in her vehicle and smoke while she was with Singh for about one hour. However, she told the jury that, as she drove to meet Singh, J.T. had asked her if he could "run through" Singh's apartment, and she had told him, "[H]ell, no." Hawthorne told the jury that she had understood J.T. to mean he wanted to go into Singh's residence and steal something. The jury learned that, during an interview with law enforcement, Hawthorne had claimed that J.T. had asked if all of them could run through Singh's apartment.

According to Hawthorne, both Ross and McDaniel came to her residence on a different day after this murder. McDaniel "threatened" her and told her that she "better not say nothing." She also told the jury that, after she was in custody for Singh's murder, she happened to see Ross on a jail bus. According to Hawthorne, Ross called her a snitch. He also said she had "better watch out" for her daughters.

The jury rejected the prosecution's theory regarding felony murder. The jury found both Ross and McDaniel not guilty of conspiracy, attempted robbery or attempted burglary. The jury acquitted both Ross and McDaniel of first degree murder. However, the jury found both of them guilty of second degree murder.[5]

---

[5]    We note that, with CALCRIM No. 522, the jury was instructed that provocation may reduce a murder from first degree to second degree. The jurors were informed that they were to decide the weight and significance of any provocation, and whether the crime was first or second degree murder. This record contains evidence that strongly

6.

## III.   The Concerns Regarding Hawthorne's Credibility.

During closing arguments, the prosecutor acknowledged that Hawthorne had credibility concerns.  The prosecutor conceded that Hawthorne had lied.  The prosecutor asked the jurors to scrutinize her testimony.

Hawthorne was initially charged with Singh's murder, and she faced a life sentence or possibly the death penalty.  She testified against Ross and McDaniel pursuant to a plea agreement.  In exchange for her truthful testimony, she agreed to be convicted as an accessory after the fact (§ 32) with credit for time served.  This plea agreement also resolved some outstanding misdemeanor charges in a different county.

Hawthorne was placed on witness relocation.  She was receiving from the state about $1,700 a month for relocation expenses.

Hawthorne was about 31 years old when this murder occurred.  She had worked as a prostitute since she was 18 years old.  She admitted to the jurors that she had stolen items from some of her prior clients, such as watches and jewelry.

At the time Singh was killed, Ross was 19 years old.[6]  Despite their age difference, Hawthorne claimed to the jury that she had a prior romantic relationship with Ross.  Through Ross, Hawthorne had previously met J.T., whom she believed was Ross's cousin.

Hawthorne denied that Ross was her pimp.[7]  However, she told the jury that Ross would occasionally go with her on calls with clients.  She would give him a percentage of her earnings in exchange for his protection.

---

suggests Singh was holding a knife when he was killed.  According to Hawthorne, McDaniel said that Singh "swung a knife at me" after McDaniel was back in her vehicle.

[6]     When Singh was killed, McDaniel was 18 years old and J.T. was 17 years old.

[7]     The jury heard evidence that suggested Ross was earning money pimping other women.

Law enforcement interviewed Hawthorne multiple times. Before she was arrested, Hawthorne lied to law enforcement, claiming she had no knowledge of Singh's death. After she was arrested, she eventually provided details about Singh's murder, culminating in her plea agreement. Hawthorne consistently denied any knowledge of a plan to rob Singh.

Hawthorne initially told law enforcement that only McDaniel exited her vehicle and confronted Singh. Law enforcement used a ruse and said witnesses had seen multiple suspects exit her vehicle. Hawthorne then claimed that both Ross and J.T. also exited her car. At one point during her statements to law enforcement, Hawthorne admitted that, when the three males exited her vehicle, she believed they were going to rob Singh.

## IV. The Jury Did Not Identify McDaniel as the Shooter.

In November 2017, law enforcement was conducting a wiretap operation of certain members of the West Side Crips. This operation was initially unrelated to Singh's homicide.

Through this wiretap operation, law enforcement discovered that, on the day after Singh's murder, J.T. called a gang member asking for .45-caliber bullets. That same day, law enforcement stopped a vehicle in Bakersfield in which McDaniel and J.T. were both back passengers. A firearm was recovered from under the seat where J.T. had been sitting.

J.T.'s DNA was on this firearm. Testing later confirmed that this firearm had been used to kill Singh. Law enforcement discovered a video on social media that showed J.T. holding this same firearm several days before Singh's murder. Ross was with J.T. in that video.

Hawthorne told law enforcement that, on the night Singh was killed, McDaniel was holding a black gun. She also told the jury that McDaniel's gun was black. However, the gun used to shoot Singh was silver, or at least had a silver-colored slide.

8.

At trial, Hawthorne said she believed McDaniel had been the shooter. According to Hawthorne, McDaniel was the only one holding a firearm when the three returned to her vehicle after she heard the shot. However, during her trial testimony, Hawthorne admitted that she never saw McDaniel shoot. She believed he was the shooter because he had held a gun, and the others had asked why he did that.

No surveillance cameras captured this shooting. Two eyewitnesses reported that the suspect who ran away was wearing a white shirt or sweatshirt. Video from social media showed Ross wearing a black shirt earlier that same day. Video from social media showed J.T. wearing a black shirt on the night of the homicide. Video from social media showed McDaniel wearing a white shirt the day before this homicide.

One eyewitness said that the male suspect who ran away got into the front passenger seat of the vehicle that sped off. Hawthorne testified that it was Ross who was the front passenger. McDaniel and J.T. were the back passengers.

Some bushes were growing in the area where Singh was shot. At trial, the two eyewitnesses stated they only saw the single suspect. However, they both agreed it was possible other suspects may have been present.

One eyewitness said the fleeing suspect was shorter than Singh. In court, the two eyewitnesses could not identify either Ross or McDaniel as the male they saw running from Singh.

The prosecutor argued to the jury that McDaniel was the shooter who killed Singh. According to the prosecutor, the evidence suggested that McDaniel dropped the phone charger when he drew his firearm. In contrast, McDaniel's trial counsel argued to the jury that J.T. must have been the shooter. McDaniel's counsel asserted that McDaniel was taller than Singh, but J.T. was shorter than Singh. McDaniel's counsel told the jury that J.T.'s height matched the description of the fleeing male.

The jurors found true that both Ross and McDaniel were principals in this murder, and another principal discharged a firearm. The jurors did not find true that McDaniel

personally discharged a firearm during this murder. The jurors also did not find true that McDaniel used a firearm when participating in a criminal street gang.

In this appeal, both Ross and respondent assert it was McDaniel who must have fatally shot Singh.

## V. The Cell Phone Evidence.

An expert for the prosecution reviewed cell phone data. The expert explained that a cell phone will connect to a cell tower within an approximate 20- to 30-mile radius.

Hours before this murder, cell phone records suggest that McDaniel, Ross, J.T., and Hawthorne were in south Bakersfield. At the time of this homicide, their cell phones were all in the vicinity of Singh's apartment complex.

On the night in question, either Hawthorne or Ross used Ross's cell phone to communicate with Singh. This was done just before Hawthorne met Singh.

The first 911 call to report Singh's murder occurred at 11:25 p.m. Around the time of this homicide, neither Ross, McDaniel nor J.T. were using their respective cell phones.

The cell phone data shows that, within minutes after Singh's homicide was reported to authorities, the phones used by Hawthorne, Ross, McDaniel and J.T. had already traveled from the area near Singh's apartment complex back to south Bakersfield.

## DISCUSSION

## I. Ross's Murder Conviction Must be Reversed Due to Insufficient Evidence.

Ross argues that his murder conviction must be reversed. According to Ross, nothing establishes his own malice. In contrast, respondent asserts we should affirm Ross's murder conviction. Respondent contends that Ross was an aider and abettor who acted with an intent to kill, or with implied malice.

### A. *The standard of review.*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could

make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### B.     *The elements of murder.*

Murder requires malice aforethought, which is either express or implied. Express malice is an intent to kill, which can be exhibited as "a deliberate intention to unlawfully take away the life of a fellow creature." (§§ 187, subd. (a); 188, subd. (a)(1).)

Implied malice occurs when a perpetrator (1) intentionally commits an act (or fails to act); (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, the perpetrator knew his act was dangerous to human life; and (4) the perpetrator deliberately acted (or failed to act) with conscious disregard for human life. (*People v. Soto* (2018) 4 Cal.5th 968, 974; see also CALCRIM No. 520.)

Malice may not be imputed to a person based solely on his participation in a crime. (§ 188, subd. (a)(3).)

### C.     *The elements to establish murder liability for an aider and abettor.*

An aider and abettor cannot be found guilty of murder based on the natural and probable consequences doctrine. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 950.) However, aiders and abettors may be convicted of murder either under a theory of direct aiding and abetting, or a theory of implied malice.

Under a theory of direct aiding and abetting, a defendant may be guilty of murder if (1) a perpetrator committed murder; (2) the defendant knew that the perpetrator intended to commit murder; (3) before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing murder; and (4) the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the

11.

crime.  (CALCRIM No. 401; *People v. Curiel* (2023) 15 Cal.5th 433, 466.)  To be guilty of murder as a direct aider and abettor, it is required that the defendant know and share the murderous intent of the actual perpetrator.  (*In re Lopez* (2023) 14 Cal.5th 562, 585.)

Under a theory of implied malice, an aider and abettor may be liable for murder if he aids in the commission of a life-endangering act.  (CALCRIM No. 526; *People v. Curiel, supra,* 15 Cal.5th at p. 466.)  Under this theory, the defendant must know the perpetrator intended to commit the life-endangering act.  (*People v. Curiel, supra,* at p. 466.)  It must be shown that the defendant intended to aid the perpetrator in the commission of that act, the defendant knew that act is dangerous to human life, and the defendant acted in conscious disregard for human life.  (*Id.* at pp. 466–467.)  The aider and abettor must "actually foresee the homicidal or life-endangering consequences of the perpetrator's actions."  (*Id.* at p. 470.)

### D.  *Substantial Evidence does not Establish Ross's Malice.*

Respondent contends that Ross was an aider and abettor who held an intent to kill. In the alternative, respondent asserts that Ross was an aider and abettor who acted with implied malice.

This record does not support either of respondent's assertions.

### 1.  *Insufficient evidence demonstrates Ross's intent to kill.*

To establish an intent to kill, respondent argues it is reasonable to infer that Ross knew J.T. was armed that fatal night.[8]  Respondent notes that Ross had previously robbed one of Hawthorne's dates, and it was Ross who insisted that his fellow gang members would accompany them on Hawthorne's date with Singh.  Respondent asserts that the younger gang members, McDaniel and J.T., would have been expected to follow Ross.

---

[8]    Several days before Singh's murder, J.T. was in a video with Ross wherein J.T. was holding the firearm used in this murder.

Respondent contends that the cell phone data "tended to show [Ross's] association with McDaniel, [J.T.], and Hawthorne at the time and location of the crime."

According to respondent, Ross, McDaniel, and J.T. began whispering amongst themselves after Singh rejected Hawthorne and she returned to her vehicle. Respondent contends it is reasonable to infer that Ross and his fellow gang members were "offended" and "upset" by Singh's rejection of Hawthorne. Respondent maintains that, as a result, Ross and the others must have "intended to shoot" Singh. Respondent asserts that, from all of the circumstantial evidence, we can infer Ross's intent to kill.

Respondent's assertions lack merit. As an initial matter, we disagree with respondent's interpretation of the record. Contrary to respondent's view, the evidence does not reasonably establish that Ross, McDaniel, and J.T. were "whispering amongst themselves" after Singh rejected Hawthorne and she returned to her vehicle. To the contrary, the passage which respondent cites only reasonably demonstrates that McDaniel and J.T. were whispering together in the backseat.

In any event, even if respondent's interpretation of the record is correct, respondent's position is nevertheless wholly unpersuasive. Hawthorne stated that she "couldn't really hear what they were saying." As such, even if Ross took part in the whispering, we have no way to know what was actually discussed. Thus, we cannot logically and reasonably draw an inference from this evidence that Ross must have held an intent to kill. (See Evid. Code, § 600, subd. (b) [an inference is a deduction of fact that may be logically and reasonably drawn from another fact or group of facts otherwise established].) In short, respondent asks us to speculate, but mere suspicion and conjecture do not represent substantial evidence. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) This evidence fails to establish Ross's express malice.

13.

Respondent's remaining arguments regarding Ross's intent to kill are also without merit. Respondent notes that all three gang members exited Hawthorne's vehicle.[9] Respondent cites the testimony of the prosecution's gang expert for the proposition that gang members are expected to assist each other, and younger gang members follow older gang members. According to respondent, it is reasonable to infer that Ross "coordinated" the actions of McDaniel and J.T., who are younger than Ross.

We may not impute malice to Ross simply because he was involved in the events leading up to Singh's death. (§ 188, subd. (a)(3).) The prosecution's gang expert had no personal knowledge regarding who killed Singh or how this murder occurred. As such, evidence regarding how gang members are expected to act in general does not establish Ross's malice on this particular occasion. Likewise, Ross's prior bad acts cannot be used to prove he acted in a particular manner on that fatal night. (Evid. Code, § 1101, subd. (a).) Ross's prior conduct, such as when he stole cocaine from one of Hawthorne's other dates, only reasonably suggests a possible intent to rob Singh. (See *id.* at subd. (b) [evidence of prior bad acts are admissible to prove, in part, motive, opportunity, and intent].)

Respondent fails to address evidence that strongly suggests Ross did not aid and abet in Singh's murder. The suspected perpetrator was heard possibly arguing with Singh. Only a single suspect was seen fleeing after Singh was shot. McDaniel's DNA was found on the charger near Singh's body. Hawthorne consistently stated that Ross and J.T. expressed surprise that Singh had been shot. According to Hawthorne, McDaniel said that Singh "swung a knife at me" after McDaniel was back in her vehicle. When asked why he did it, McDaniel said he had to get out his aggression because his girlfriend

---

[9]     During one of her interviews with law enforcement, Hawthorne stated that she lost sight of Ross when he left her vehicle with the others. However, during that same interview, she said Ross was "back instantly" when she heard the "bang," and it was like Ross "didn't even make it by them or something."

had been assaulted, and he was mad. Hawthorne testified that only McDaniel was seen with a firearm that night. When officials turned over Singh's body, they discovered a kitchen knife lying under him. Nothing from the totality of this evidence reasonably suggests that Ross aided and abetted the perpetrator with an intent to kill, or that Ross even knew somebody was going to fire at Singh.

Substantial evidence does not establish beyond a reasonable doubt that Ross committed second degree murder as a direct aider and abettor. Nothing reasonably suggests that Ross knew the perpetrator intended to commit murder. Nothing shows that, before or during the commission of the crime, Ross intended to aid and abet the perpetrator in committing murder. Nothing demonstrates that Ross's words or conduct did in fact aid and abet the perpetrator's commission of this murder. (CALCRIM No. 401; *People v. Curiel, supra,* 15 Cal.5th at p. 466.) In short, respondent's arguments are wholly unpersuasive that substantial evidence establishes Ross's liability for second degree murder under a theory of direct aiding and abetting.

### 2. *Insufficient evidence demonstrates Ross's implied malice.*

To establish implied malice, respondent argues it was McDaniel who must have shot Singh. According to respondent, a reasonable inference may be drawn from the record that Ross "and his cohorts planned, at a minimum, a violent confrontation" with Singh while armed with a firearm. Respondent again points to the "whispering" that occurred before the males exited Hawthorne's vehicle. Respondent contends it is reasonable to infer that Ross "and his fellow gang members sought retaliation" against Singh "for rejecting Hawthorne and depriving them of a share of Hawthorne's profits." Respondent asserts that the confrontation "created a grave danger" for Singh's life, Ross was aware of that danger, and he consciously disregarded it. As such, respondent takes the position that we should find substantial evidence of Ross's implied malice for murder.

Respondent's assertions regarding implied malice are also unpersuasive. We cannot reasonably conclude from the "whispering" that Ross must have intended for

15.

somebody to shoot at Singh. Again, we have no way to deduce from the evidence the actual topic of that conversation, or to what extent Ross participated in that discussion. Respondent asks us to speculate, and speculation does not represent substantial evidence. (*People v. Davis, supra,* 57 Cal.4th at p. 360.)

Under prior law, a defendant who aided and abetted an intended assault could be liable for murder if the murder was the natural and probable consequence of the intended assault. (*People v. Curiel, supra,* 15 Cal.5th at p. 449.) However, the natural and probable consequences doctrine may no longer be used to establish an accomplice's liability for murder. (*Ibid.*) Accordingly, we reject respondent's assertion that planning "a violent confrontation" establishes Ross's liability for murder.

This record does not contain substantial evidence establishing beyond a reasonable doubt that Ross committed second degree murder as an aider and abettor under a theory of implied malice. Nothing reasonably suggests that Ross knew the perpetrator intended to shoot at Singh. Nothing shows that Ross intended to aid the perpetrator in the commission of that life-endangering act. (CALCRIM No. 526; *People v. Curiel, supra,* 15 Cal.5th at pp. 466–467.) In short, respondent's arguments are wholly unpersuasive that substantial evidence establishes Ross's liability for second degree murder as an aider and abettor under a theory of implied malice.

### 3. *The prosecutor's closing arguments confirm our interpretation of the record.*

Our conclusion that substantial evidence fails to establish Ross's liability for second degree murder is bolstered by the prosecutor's arguments to the jury. The prosecutor made it clear that, if Ross was guilty of murder, he was guilty under a theory of first degree felony murder. The prosecutor told the jurors he was not going to review the lesser-included offenses of murder for Ross because second degree murder and manslaughter "only apply to the alternative, willful, premeditated theory." The prosecutor told the jury that second degree murder applied to McDaniel, who was

16.

"differently situated" from Ross. In effect, the prosecutor informed the jurors that, if Ross was guilty of murder, he was guilty only under a theory of first degree felony murder, and not murder requiring an intent to kill, such as second degree.

This record suggests that Ross coordinated a plan to rob or burglarize Singh. However, the jury rejected the prosecutor's theory that Ross aided and abetted first degree felony murder. Instead, the jury found Ross guilty of second degree murder, a theory which the prosecutor did not pursue against Ross. In fact, the prosecutor essentially admitted to the jury that such a theory did not apply to Ross.

The jury's second degree murder conviction cannot stand. Nothing reasonably suggests that Ross knew and shared the murderous intent of the actual killer. Nothing reasonably demonstrates that Ross aided or encouraged the commission of this murder. (*In re Lopez, supra,* 14 Cal.5th at p. 585.) Likewise, nothing reasonably suggests that Ross knew the perpetrator was going to shoot at Singh, or that Ross intended to aid the perpetrator, or that Ross actually aided the perpetrator in the commission of that life-endangering act. (*People v. Curiel, supra,* 15 Cal.5th at pp. 466–467.) Malice may not be imputed to Ross simply because of his participation in the events leading up to Singh's homicide. (§ 188, subd. (a)(3).)

This record does not contain substantial evidence from which a reasonable jury could find beyond a reasonable doubt that Ross was guilty of second degree murder as an aider and abettor. Evidence does not reasonably demonstrate Ross's malice for murder, either express or implied. Accordingly, Ross's murder conviction must be reversed.[10] Based on the principle of double jeopardy, retrial is barred. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 39.)

---

**10** Because we reverse the murder conviction in count 1, we do not address Ross's alternative claim of instructional error.

17.

## II.     Ross's Gang Conviction Must be Reversed Due to Insufficient Evidence.

At trial, the prosecution's gang expert opined that the West Side Crips are an active criminal street gang in Bakersfield, California.  The expert went over the primary activities of that gang, which included murder and robbery.  The gang's structure and hierarchy were explained.

The gang expert opined that, when Singh's murder occurred, Ross, McDaniel, and J.T. were all active members of the West Side Crips.  The expert opined that Hawthorne was not a gang member.  There was no evidence that Singh was involved in a gang.

Based on a hypothetical matching the evidence surrounding Singh's murder, the gang expert opined that this killing was done for the benefit of, in furtherance of, and in association with the West Side Crips.

In count 1, the jury convicted Ross of murder.  The jury found true a gang enhancement (§ 186.22, subd. (b)(1)).  The jury also found true a firearm enhancement (§ 12022.53, subds. (d), (e)(1)).

In count 6, the jury convicted Ross of participation in a street gang (§ 186.22, subd. (a)).

Ross asserts that his gang conviction in count 6 and the gang enhancement in count 1 must be reversed for insufficient evidence.  Because the firearm enhancement in count 1 is contingent on the gang enhancement, he contends it also must be reversed.

Respondent concedes that both the gang enhancement and the firearm enhancement in count 1 must be reversed due to insufficient evidence.  We agree.  However, those issues are moot because we have already held that the murder conviction in count 1 must be reversed for insufficient evidence.

The remaining issue before us is the gang conviction in count 6.

It is a felony if a person "actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by

18.

members of that gang." (§ 186.22, subd. (a).) Respondent argues that we should affirm Ross's gang conviction because Ross committed murder. In the alternative, respondent contends that Ross was pimping Hawthorne, which was the "felonious criminal conduct" committed by members of Ross's gang. As such, respondent asserts that substantial evidence supports the gang conviction in count 6.

We reject respondent's arguments. Because we are reversing Ross's murder conviction, Singh's murder no longer establishes that Ross willfully promoted, furthered, or assisted in felonious criminal conduct by members of his gang. (See § 186.22, subd. (a).)

Regarding pimping, respondent is correct that some evidence suggests Ross was engaged in pimping activities. However, a theory of pimping was never presented to Ross's jury. This jury was never instructed that pimping could serve as the "felonious conduct" justifying the gang conviction in count 6. Instead, the jury was informed that the "felonious criminal conduct" which Ross must have promoted, furthered or assisted as a gang member was murder, attempted robbery, or attempted burglary.

We "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." (*Chiarella v. United States* (1980) 445 U.S. 222, 236.) "Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury." (*McCormick v. United States* (1991) 500 U.S. 257, 270–271, fn. 8; accord *People v. Pennington* (2017) 3 Cal.5th 786, 800.) Accordingly, respondent's position lacks any merit.

This record does not contain substantial evidence based on a theory presented to the jury establishing that Ross willfully promoted, furthered, or assisted in felonious

criminal conduct by members of his gang.  (§ 186.22, subd. (a).)  Therefore, the gang conviction in count 6 must be reversed for insufficient evidence, and retrial is barred.[11]

We will remand this matter for resentencing.  Ross's determinate abstract of judgment includes convictions in four separate criminal cases, including the judgment in this matter.  Because part of Ross's aggregate judgment has been stricken on review, a full resentencing is required so the trial court can exercise its sentencing discretion in light of the changed circumstances.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  The trial court shall impose a new aggregate term of imprisonment for his remaining convictions in the multiple cases.  (§ 1170.1, subd. (a).)

## DISPOSITION

The murder conviction in count 1 is reversed for insufficient evidence.  The gang conviction in count 6 is reversed for insufficient evidence.  Retrial is barred.  The judgment in this matter is vacated.  This matter is remanded so the court may resentence Ross on his remaining felony convictions.

LEVY, Acting P. J.

WE CONCUR:

SNAUFFER, J.

FAIN, J.*

---

[11]     Because we reverse both of Ross's convictions, we do not reach his claims that he received ineffective assistance of counsel, or that he is entitled to additional custody credits.

*     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.